## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| **Plaintiffs AW, WL, RC, MJ, CM, and** | ) | |
| **HH on behalf of themselves and** | ) | |
| **all others similarly situated, and** | ) | |
| **Protection and Advocacy for People** | ) | |
| **with Disabilities, Inc., a South Carolina** | ) | |
| **non-profit corporation;** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL CASE NO:** 2:17-cv-1346- RMG |
| | ) | |
| **vs.** | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| | ) | **FOR INJUNCTIVE AND** |
| | ) | **DECLARATORY RELIEF** |
| **John H. Magill, in his official** | ) | |
| **capacity as the Director of the** | ) | |
| **South Carolina Department** | ) | |
| **of Mental Health; the** | ) | |
| **South Carolina Department** | ) | |
| **of Mental Health; and the South Carolina** | ) | |
| **Mental Health Commission;** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

Plaintiffs file this class action to enforce the rights of people with mental disabilities to receive services in the most integrated setting appropriate to their needs.

In support of their prayer for relief, Plaintiffs allege the following:

### PRELIMINARY STATEMENT

1.     Every day, adults with mental disabilities are unnecessarily and illegally segregated in South Carolina's G. Werber Bryan Psychiatric Hospital ("Bryan" or "Bryan Hospital").  These adults remain in this isolating institution because Defendants have failed to develop sufficient community-based mental health services.

2.    These residents of Bryan Hospital experience the type of "[u]njustified isolation" that the Supreme Court calls "discrimination based on disability." *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999).

3.    Contrary to modern and generally accepted methods of providing mental health care, this isolation at Bryan may last for years, possibly decades.  All too often, this isolation happens not because it is necessary to facilitate care, but rather because Defendants have not provided the services, programs, and activities to support these individuals in the community where Plaintiffs can live healthy, productive lives.

4.    Individual Plaintiffs bring this action on their behalf and on the behalf of others similarly situated under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") to require the Defendants to administer "services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130 (d); 28 C.F.R. § 41.51 (d).  Protection and Advocacy for People with Disabilities, Inc. ("P&A") brings this action on behalf of its constituents.

5.    Defendants violate their obligation to comply with the ADA and Section 504 by:

   a.   unjustifiably isolating and segregating individuals at Bryan Hospital;

   b.   failing to consistently provide adequate integrated services in the community;

   c.   overly and inappropriately relying upon segregated residential facilities for outpatient treatment;

   d.   failing to develop and maintain a working plan for implementing the ADA's integration mandate;

   e.   employing policies and practices that create arbitrary barriers to discharge and access to community mental health services, programs, and activities; and

    f.   charging the Plaintiffs fees of $503 per day for unnecessary and unjustified

        hospitalization, creating a perpetual burden of debt that will follow them to their

        death, making any attempt at accumulating wealth and planning for inheritance

        potentially meaningless.

The Defendants' policies and practices, their failure to remove discriminatory barriers, and their failure to reasonably modify their programs and services to make integrated community mental health services available, have consigned individuals at Bryan to prolonged and unnecessary institutionalization.

6.    Individual Plaintiffs, Plaintiff class, and P&A constituents[1] are harmed by the isolation and segregation caused by the Defendants.  This isolation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Olmstead*, 527 U.S. at 600.

## JURISDICTION AND VENUE

7.    This is an action for declaratory and injunctive relief for violations of Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, *et seq*. and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794, *et seq*.

8.    Jurisdiction for these claims is based on 28 U.S.C. §§ 1331, 1343 (a) (3) and (4).

9.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202 and Rule 65, Federal Rules of Civil Procedure.

---

[1] Hereinafter individual Plaintiffs, Plaintiff class, and P&A constituents, collectively, shall be referred to as "Plaintiffs."

10.    Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391 (b) because: Defendants reside, operate, and perform their official duties in this District; a substantial part of the actions and omissions of which Plaintiffs complain occurred in this District; and Plaintiffs are institutionalized in this District.

11.    Venue is proper in the Charleston Division because the Defendants do business in this Division relating to the events and omissions alleged in this complaint and where a substantial part of the events and omissions giving rise to the claim occurred.

## PARTIES

### Individual Plaintiffs

12.    Each named plaintiff is a patient of Bryan Hospital.  For each named plaintiff, community based services and supports would be appropriate.  None of the named plaintiffs oppose community based treatment.  Each named plaintiff has been involuntarily committed to Bryan Hospital.

### *AW*

13.    AW was born in 1983.  He is from Georgetown County.

14.    AW has lived at Bryan the majority of his adult life, starting in 2007.

15.    AW is a person with a mental disability.

16.    AW is substantially limited in his ability to learn and to care for himself.  He has a learning disability that affects his ability to read and write.

17.    AW is qualified to receive services from SCDMH and does receive services from SCDMH.

18.     In his most recent admission, AW was admitted to Bryan on December 3, 2013.  He has

spent the last forty-one months in a locked ward at Bryan, except for periods of time where he

was temporarily released into the care of family, known as going on a "pass."

19.     As of April 24, 2017, AW's bill for his care during his current admission at Bryan is

estimated at $621,708.  The total bill for his care since 2007 may exceed a million dollars.

20.     AW loves art and working.  Bryan staff limits his access to art in both time and the

mediums with which he is allowed to work.  He wants to be discharged so that he can pursue his

art whenever he wants.  He also wants to work in the community.

21.     AW's treatment team has attempted to get his mother to accept him into her care, but she

has not been able to do more than to allow him to come home for extended passes.  Because he

does not have a place to live and a way to receive the level of services he needs, he remains at

Bryan.

22.     AW could be safely discharged to live in the community if Defendants provided adequate

services to meet his needs, as is required of the Defendants under the ADA and Section 504.

### *WL*

23.     WL was born in 1952 in Hartsville, South Carolina.  She was left at the State Hospital in

Columbia at age twelve and remained there until she turned twenty-four.  Since then she has had

many hospitalizations, but she has also had times where she received adequate services in the

community and succeeded in the community.

24.     WL is a person with a mental disability.

25.     WL is substantially limited in her ability to work and to care for herself.  She also needs

assistance with walking and uses a walker to assist her and reduce the risk of falls.

26.    WL is qualified to receive services from SCDMH and does receive services from SCDMH.

27.    In her most recent admission, WL was admitted to Bryan on September 26, 2015.  She has been at Bryan for twenty months.  Her treatment team has been seeking discharge the majority of that time, but they have not been able to identify a place where she could live and have her needs met.

28.    As of April 24, 2017, WL's bill for her care for her current admission at Bryan is estimated at $289,225.  Given her prior admissions, the total amount of what she owes SCDMH may exceed a million dollars, including charges for days she was in the hospital but did not require hospitalization.

29.    WL is frustrated with the time she has spent in the hospital.  She knows that she has become dependent upon the care she receives but wants to live more independently.  She would like to live in a situation where she would share a house with someone who could assist her with transportation and help her if she has a seizure.

30.    WL could be safely discharged to live in the community if Defendants provided adequate services to meet her needs, as is required of the Defendants under the ADA and Section 504.

### *RC*

31.    RC was born in 1975.  He is from Williamsburg County.

32.    RC is a person with a mental disability.

33.    RC is substantially limited in his ability to work and to care for himself.

34.    RC is qualified to receive services from SCDMH and does receive services from SCDMH.

35.     RC was admitted to Bryan on September 29, 2015.  He has been at Bryan for twenty months.

36.     As of April 24, 2017, RC's bill for his care during his current admission at Bryan is estimated at $287,716.

37.     RC wants out of Bryan and has been frustrated with many delays.  The most recent delay may last for ninety days because he needs to apply to be eligible for a state benefit.  His treatment team has been seeking his discharge for several months, but because his benefits need to be initiated, his discharge has been delayed.

38.     RC could be safely discharged to live in the community if Defendants provided adequate services to meet his needs, as is required of the Defendants under the ADA and Section 504.

### *MJ*

39.     MJ was born in 1960.  He is from Richland County.

40.     MJ is a person with a mental disability, according to his physician.

41.     MJ is substantially limited in his ability to work.  He does not have any significant job history.

42.     MJ is qualified to receive services from SCDMH and does receive services from SCDMH.

43.     For his most recent admission to Bryan, MJ was admitted on October 14, 2010.

44.     As of April 24, 2017, MJ's bill for his care during his current admission at Bryan is estimated at $1,197,643.

45.     He would like to be discharged to have more control over his life.  He hopes to get a job and be able to get dentures.

46.     MJ's treatment team has been working with his family on a discharge plan, wanting his family to provide the care and supervision he needs.  Because those plans with family have not been able to be finalized, he remains in Bryan.

47.     MJ could be safely discharged to live in the community if Defendants provided adequate services to meet his needs, as is required of the Defendants under the ADA and Section 504.

*CM*

48.     CM was born in 1990.  She is originally from the Charleston area.

49.     CM is a person with a mental disability.

50.     CM is substantially limited in her ability to work.  She has very little work history, but she did work a few hours a week in one facility where she was a resident.

51.     CM is qualified to receive services from SCDMH and does receive services from SCDMH.

52.     CM was admitted to Bryan on May 11, 2011, at the age of 19.  She will soon turn 27. She has spent the past 72 months in a locked unit at Bryan.

53.     In May of 2017, she agreed to go on a "pass" to spend several weeks living in a Homeshare, which is similar to an adult foster home.  A "pass" is when a patient leaves the hospital for a period of time.  After the pass expires, CM may be discharged, or she may return to Bryan.  During the pass, she remains a patient at Bryan and does not receive services from the Community Mental Health Center (CMHC).

54.     As of April 24, 2017, CM's bill for her care during her current admission at Bryan may be as high as $1,059,318.  Upon information and belief, she continues to accrue charges while she is on a pass.

55.     CM realizes that she has missed much of her youth while at the hospital to the point that she is dependent upon the hospital even though it is not necessary.  She desires to receive the supports she needs to transition to living in the community.  Even though she is currently in a Homeshare setting, she hopes to be live in her own apartment with assistance in learning independent living skills and to work on having her poetry published.

56.     CM's treatment team feels she is not only ready for discharge, but also that continued hospitalization has a negative impact on her ability to live independently.

57.     CM could be safely discharged to live in the community if Defendants provided adequate services to meet her needs, as is required by the Defendants under the ADA and Section 504.

*HH*

58.     HH was born in 1958.  He is from Charleston County.

59.     HH is a person with a mental disability.

60.     HH is substantially limited in his ability to work and to care for himself.

61.     HH is qualified to receive services from SCDMH and does receive services from SCDMH.

62.     HH was admitted to Bryan on October 12, 2014.  He has been at Bryan for thirty-one months.

63.     As of April 24, 2017, HH's bill for his care during his current admission at Bryan is estimated at $462,257.

64.     HH has been frustrated with the CRCF options he has had for discharge.  The most recent option provided to him was discharge at a facility with 70 beds.  He did not like that facility, and he wants to have his own place with services.

65.     HH could be safely discharged to live in the community if the Defendants provided

adequate services to meet his needs, as is required of the Defendants under the ADA and Section

504.

### *P&A*

66.     P&A is an independent, statewide, non-profit corporation that is authorized to seek legal

and equitable relief.

67.     P&A is designated to protect and advance the legal rights of people with disabilities,

including the right of people with disabilities to live in the most integrated setting appropriate.

68.     P&A is part of a nationwide network of protection and advocacy agencies located in all

fifty states, the District of Columbia, Puerto Rico, and the federal territories.  The protection and

advocacy system comprises the nation's largest provider of legally based advocacy services for

people with disabilities.

69.     Since September of 1977, pursuant to federal law, P&A has been the designated

protection and advocacy system for people with disabilities, designated by then-South Carolina

Governor James Edwards.  In 1979, P&A, then known as Advocacy for Handicapped Citizens,

was designated by legislation as the federally mandated protection and advocacy system in South

Carolina.  S.C. Code Ann. § 43-33-310 to 43-33-400.

70.     As the protection and advocacy system for South Carolina, P&A serves as the designated

agency to implement the Protection and Advocacy for Individuals with Mental Illness Act

(PAIMI), 42 U.S.C. §§ 10801 – 10807, 10821 - 10827; the Protection and Advocacy for

Individuals with Developmental Disabilities Act (PAIDD), 42 U.S.C. §§ 15041-15045; the

Protection and Advocacy for Individuals with Traumatic Brain Injury Act (PATBI), 42 U.S.C. §

300d-53; and the Protection and Advocacy for Individual Rights Act (PAIR), 29 U.S.C. § 794e.

Pursuant to federal law, P&A has the statutory authority to pursue legal, administrative, and other appropriate remedies to advocate for the rights and interests of people with disabilities. Likewise, under state law, P&A "shall protect and advocate for the rights of all . . . handicapped persons by pursuing legal . . . remedies to insure the protection of the rights of these persons." S.C. Code Ann. § 43-33-350(1).

71.     The federal regulations governing the P&A network provide that each P&A system is authorized to bring "lawsuits in its own right to redress incidents of abuse or neglect, discrimination and other rights violations impacting on individuals with mental illness and when it appears on behalf of individual plaintiffs or a class of plaintiffs for such purposes."  42 C.F.R. § 51.6 (f).

72.     As required by 42 C.F.R. § 51.23, P&A has a PAIMI Advisory Council that meets quarterly and advises P&A's Board.  Sixty percent of the members of the Advisory Council must be, and are, people with mental disabilities or people who have a family member with a mental disability.  The chair of the Advisory Council must be, and is, a person with a mental disability or a family member of a person with a mental disability.  The Advisory Council solicits public input and recommends priorities to P&A's Board.  The chairperson of the Advisory Council is a member of the P&A's Board of Directors.

73.     A majority of the members of P&A's Board of Directors are people with disabilities or people with family members with disabilities.  The Board of Directors is responsible for the overall management of P&A and for setting case and advocacy priorities, with advice from the Advisory Council.

74.     P&A, the Board of Directors, and the Advisory Council seek input from P&A's constituents, people with disabilities, and others on P&A's goals and priorities.  This process of

seeking input includes a yearly meeting at Bryan Hospital, attended by Bryan residents. The most recent meeting of this kind was held on August 22, 2016.

75.     At the yearly meeting at Bryan on P&A's goals and priorities, residents of Bryan are provided with information regarding P&A's current priorities and information on how to provide input on P&A's future priorities. Residents frequently mention their desire to be discharged and comment on problems with delays in discharge. Because of this input and input from the Advisory Council and others, one of P&A's priorities is promoting inclusion in the community—"To facilitate the community integration of individuals with disabilities by protecting their rights to receive appropriate supports and service, in the most integrated settings." Protection and Advocacy for People with Disabilities, Inc. 2016-2017 Goals, available at http://www.pandasc.org/about/priorities/ (last viewed April 14, 2017).

76.     Based upon P&A's goals and priorities, P&A supports and represents people with mental disabilities at Bryan Hospital, including advocating for their discharge. P&A also serves people who receive mental health services in the community.

77.     P&A constituents include all of the individual Plaintiffs, members of the Plaintiff class, and others who could bring an action against the Defendants on their own behalf under the ADA and Section 504.

78.     For the past several years, P&A has visited Bryan Hospital approximately 50 times per year. At Bryan, P&A meets with clients; monitors the facility; attends treatment team meetings; advocates for the individuals living in the facility, including advocating for timely and appropriate discharge; and investigates allegations of abuse, neglect, and exploitation.

79.     For the last decade, P&A has worked with 44 constituents in Bryan Hospital on issues related to their discharge. For individuals living in the community, P&A has advocated for

increased access to community mental health services, including bringing two cases through the internal grievance process developed by the Defendants.  In addition to specific case by case advocacy, P&A has also advocated for a resolution to the issues raised in this complaint by participating on committees, issuing reports, and writing letters to and meeting with the Defendants.

80.     AW, WL, RC, MJ, CM, and HH are P&A constituents.

81.     Many of P&A's constituents have faced discrimination by being isolated and segregated at Bryan Hospital.  P&A constituents include individuals who:

   a.   Need nursing home care (a less restrictive setting than Bryan), but Defendants, who operate nursing homes will not admit them;

   b.   Have become intensely dependent upon the hospital to the point that even though discharge is what they want, they are fearful of being discharged;

   c.   Deteriorate while waiting on placement because of the length of time it takes;

   d.   Become depressed because they see no hope that they will live in any other setting; and/or

   e.    Cannot be discharged because Defendant's discharge planning relies heavily on discharge to CRCF settings and the constituents have needs, such as the management of sliding-scale insulin, which cannot be addressed in a CRCF setting.

82.     P&A has successfully asserted its associational standing to vindicate the rights of people with disabilities, including in class action litigation, and specifically the rights of people with mental disabilities.

**Defendants**

83.     Defendant John H. Magill ("Magill" or "Defendant") is the State Director of Mental Health and chief executive of the South Carolina Department of Mental Health (SCDMH). "Subject to the supervision and control of the Mental Health Commission, the state director shall administer the policies and regulations established by the commission."  S.C. Code Ann. § 44-9-40.

84.     Magill is appointed by the South Carolina Mental Health Commission ("Commission" or "Defendant").  S.C. Code Ann. § 44-9-40.

85.     Magill is sued in his official capacity only.

86.     Magill has control and responsibility over SCDMH, as directed by the Commission.

87.     SCDMH, as an agency of South Carolina, was created by S.C. Code Ann. § 44-9-10.

88.     SCDMH has "jurisdiction over all of the State's mental hospitals, clinics and centers, [and] joint State and community sponsored mental health clinics and centers…."  S.C. Code Ann. § 44-9-10.

89.     As a department of the State of South Carolina, SCDMH is a public entity covered by Title II of the ADA.  42 U.S.C. § 12131 (1); 28 C.F.R. § 35.104.

90.     SCDMH is a recipient of federal funds, including funds from the Medicaid and Medicare program and the mental health block grant program.

91.     The Commission is the governing body of the SCDMH and has jurisdiction over the state's public mental health system.

92.     The Commission has seven members who are appointed for five-year terms by the governor with the advice and consent of the Senate.  S.C. Code Ann. § 44-9-30.

93. The Commission determines policies and has authority "to promulgate regulations governing the operation of the department and the employment of professional and staff personnel." S.C. Code Ann. § 44-9-30 (C).

94. By statute, the Commission is required "to provide a statewide system for the delivery of mental health services to treat, care for, reduce, and prevent mental illness and provide mental health services for citizens of this State, whether or not in a hospital. The system must include services to prevent or postpone the commitment or recommitment of citizens to hospitals." S.C. Code Ann. § 44-9-90.

95. The Commission may require reports from the director of a state hospital "relating to the admission, examination, diagnosis, discharge, or conditional discharge of a patient . . . ." S.C. Code Ann. § 44-9-100.

96. The Commission, through its director, Magill, operates SCDMH (Commission, Magill, and SCDMH, collectively, shall be referred to as "Defendants"). Together, the Commission and Magill have control over the direction of SCDMH.

97. Defendants are subject to the requirements of Section 504 of the Rehabilitation Act because SCDMH receives federal funds.

98. Defendants administer mental health services in institutional settings and in the community.

99. Defendants are responsible for ensuring that individuals with disabilities who are qualified for SCDMH services are served in accordance with federal law, including the ADA and Section 504.

100. SCDMH is divided administratively into two divisions—inpatient services and outpatient services.

101.     SCDMH's inpatient division operates two state psychiatric hospitals, three nursing homes, one alcohol and drug addiction treatment center, and one sexually violent predator program.  Two additional nursing homes are being planned.

102.     The state hospitals operated by Defendants are Bryan Hospital in Columbia and Patrick B. Harris Psychiatric Hospital ("Harris Hospital") in Anderson.

103.     Bryan Hospital (licensed for 530 beds) and Harris Hospital (licensed for 200 beds) make up over 40% of all the psychiatric hospital beds in the state.  These two hospitals are the largest psychiatric hospitals in the state.

104.     Defendants divide the state into four geographical areas called regions, each designated by a letter:  Region A, Region B, Region C, and Region D.  Regions A, C, and D are in the eastern or lower portion of the state.  Region B is in the western or upstate portion of the state.

105.     Individuals from Regions A, C, and D who need to receive services from a state hospital are usually confined at Bryan Hospital.  Individuals from Region B, the upstate region, who need to receive services from a state hospital, are usually confined at Harris Hospital.

106.     SCDMH's outpatient division, also known as the division of community mental health services, operates seventeen CMHCs.  Each center is responsible for a "catchment area" of the state, and oversees the various, albeit limited, community based services that operate in the catchment area.  Each catchment area is assigned to a Region.

107.     The services that are provided and the services that are available are not consistent at each of the seventeen CMHCs.  The SCDMH outpatient division offers a limited and inconsistent array of services, office hours, and options throughout the CMHC system.

## CLASS ACTION ALLEGATIONS

108.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other individuals similarly institutionalized in Bryan Hospital, which is operated by the Defendants.  Plaintiffs seek declaratory and injunctive relief individually and on behalf of the class to remedy and prevent their needless institutionalization in Bryan Hospital.

109.    The proposed class consists of current and future adult, non-forensic residents of Bryan Hospital who, with appropriate supports and services, would now or in the future be able to live in an integrated community setting and who do not oppose living in an integrated community setting.

110.    *Numerosity*.  The class is so numerous that joinder of all members is impracticable.  As of May 2017, 152 adults were confined at the adult services portion of Bryan.  According to the 2016/2017 budget, the number of beds is increasing from 140 to 160 in the 2016/2017 state fiscal year.

111.    *Commonality*.  There are questions of law and fact common to the class including:

a. Whether Defendants are violating the ADA and the Rehabilitation Act by failing to provide services in the most integrated setting appropriate to the needs of the Plaintiffs.

b. Whether Defendants are violating the ADA and the Rehabilitation Act by utilizing methods of administration in their mental health system resulting in isolation and segregation of the Plaintiffs.

c. Whether Defendants are violating the ADA by failing to make reasonable modifications to programs and services to provide the Plaintiffs integrated community services needed to end unnecessary hospitalization.

d. Whether Defendants are violating the ADA and the Rehabilitation Act by overly and inappropriately relying upon segregated facilities, namely Community Residential Care Facilities (CRCFs), for outpatient treatment.

e. Whether the Defendants are violating the ADA and the Rehabilitation Act by failing to have a comprehensive and effective working plan for serving Plaintiffs in the least restrictive setting appropriate to their needs—an *Olmstead* plan. *See Olmstead v. L.C*., 527 U.S. 581, 587 (1999).

f. Whether the Defendants should be enjoined from issuing or collecting on bills directed to Plaintiffs which were accrued when the Plaintiffs were hospitalized but desired discharge, were ready to be discharged, and could have been discharged if the Defendants had provided services in the most integrated setting appropriate.

112.   *Typicality*.  The individual Plaintiffs' claims are typical of the class, such that the individual Plaintiffs will adequately and fairly represent the interests of the class members.

113.   *Adequate Representation*.  The individual Plaintiffs will fully and vigorously prosecute this action.  The individual Plaintiffs do not have any interests antagonistic to those of other class members.  By filing this action, the individual Plaintiffs have displayed an interest in vindicating their rights, as well as the rights of others who are similarly situated.

114.   Attorneys representing the individual Plaintiffs are experienced in and knowledgeable about civil rights litigation, the ADA, Section 504, the management of class action litigation, and practice and procedure in the federal courts.

115.    The individual members of the class would have difficulty pursuing their own claims or remedying systematic violations on their own.

116.    Defendants have administered the South Carolina mental health system in a way that discriminates against persons with mental disabilities by failing to provide the community-based services required to prevent unnecessary institutionalization, including needlessly prolonged or repeated institutionalization of the Plaintiffs.  Therefore, the Defendants have acted or refused to act on grounds that apply generally to the class, making injunctive and/or corresponding declaratory relief appropriate with respect to the class as a whole.  As a result, and consistent with similar civil rights actions, the Plaintiffs seek certification pursuant to Fed. R. Civ. P. 23 (b)(2).

## FACTS

### Bryan Hospital and the Hospital Discharge Process

117.    South Carolina has a long, unfortunate history of confining people with mental disabilities to isolated asylums where they are segregated from their homes and communities.

118.    The former South Carolina State Hospital, located in Columbia on the Bull Street campus, was one of the first public mental health hospitals established in the United States.  The State Hospital on Bull Street has closed; South Carolina's discriminatory practices continue.

119.    Ten miles from the Bull Street campus, Defendants have planned, supported, constructed, and expanded Bryan Hospital.  Licensed for 530 beds, Bryan serves the same function as the State Hospital.

120.    A new 32-bed unit was included in the Defendant's proposed budget for the 2017/2018 state fiscal year.

121.    Just as they were at the State Hospital, individuals with mental disabilities are warehoused at Bryan, isolated from their families, friends, and communities.

122.    Bryan's licensed beds are classified as "adult services," including both long-term units and acute units; "forensics"; and "children's acute care."  Adults who are not involved in the criminal justice system are typically assigned to "adult services" beds.  This Complaint focuses on the individuals assigned to adult services, non-forensics beds.

123.    Most of the approximately 152 residents of the adult care lodges at Bryan Hospital face needless delays in discharge.  Some individuals may wait years to be discharged.  At any given moment, as many as half of the 152 residents of the adult care portion of Bryan are stable and could be discharged to a less restrictive setting, if adequate supports were readily available in the community.

124.    The residents of Bryan get stuck at the hospital because of the Defendants' policies, practices, and procedures—including an over-reliance on institutional placements.  These "stuck" individuals are being warehoused at Bryan because of Defendants' acts and omissions and not because they require hospitalization.

125.    Adults confined at the non-forensic portion of Bryan Hospital are held in separate units. The units are called "lodges."  There are five lodges.  Each lodge is further divided into three "pods."  Each pod contains three bedrooms and a central common area.  Up to four individuals sleep in a room.

126.    All non-forensic adults confined at Bryan Hospital remain behind the locked doors of the lodges for the majority of the day.  Individuals who have violated the rules of the lodges are not allowed to leave the lodge at any time of the day—sometimes referred to as being "on restriction."  Individuals who are not "on restriction" are allowed to leave the lodges only in

supervised groups to go to the cafeteria, the canteen, any activities, and the facility's library. These trips are limited based upon staff availability and the weather.

127.    Each lodge has a central paved atrium with no roof.  The atriums contain only metal benches.  Access to the paved atrium is limited based upon weather conditions.

128.    Movement is even limited in the lodge.  During the day, individuals are not allowed free access to their rooms or the common area portion of the pods.  All access is controlled by locked doors.

129.    Residents of Bryan Hospital have almost no interaction with members of the community or choices about their day-to day-activities.  While confined at Bryan, adults with mental health disabilities are cut off from the people they care about and the people who care about them. They may only visit with friends or family at "visiting hours"; they may only talk on the phone during "phone hours"; and their only opportunity to work is to perform janitorial services on the lodge (only two residents are allowed to be so employed).  The primary choice that the residents are allowed to control in their day-to day-life is where to sit in the day area.  All other choices are made for them—what to eat, what to do, where to sleep, when to shower, when to get up, and when to go to bed.

130.    Most of the individuals confined at Bryan do not have private insurance, but would be eligible for Medicaid if they lived in the community.  However, most cannot access Medicaid to pay for care at Bryan, as Medicaid is only available to fund psychiatric hospitalizations for eligible Medicaid participants who are under age 21 or over age 65.

131.    In contrast, Medicaid funds many community mental health services, regardless of the age of the eligible participant.

132.    Individuals eligible for Medicare fare little better.  Medicare Part A has a limited, inpatient psychiatric hospital benefit that has a lifetime cap of 190 days, a deductible of $1288 per benefit period, and an increasing coinsurance cost to the patient after 60 days.  Medicare Part B covers some outpatient services, including individual and group therapy, psychiatrist visits, and medication management.

133.    Individuals without insurance that covers psychiatric hospitalization are billed a minimum of $503 dollars for each day they are confined at Bryan.  Therefore, residents at Bryan who are eligible for public assistance programs in the community, like Medicaid, are billed $503 dollars for each day they are in the hospital.

134.    The Defendants also bill for some services in addition to the daily rate, such as physician services.

135.    Individuals who remain confined due to a lack of community support programs and services accrue massive bills.  The cost of one year at Bryan is approximately $183,595.  Being discharged in a timely manner, as well as avoiding hospitalization, is critically important to the Plaintiffs for their physical, psychological, and financial well-being.

136.    A decision on whether a resident of Bryan Hospital is ready for discharge is frequently based upon what is available (or not) in the community, rather than whether or not the individual's psychiatric condition has stabilized to the point they can be safely reintegrated into the community.

137.    Defendants have failed to adequately assess and identify the long term needs of the Plaintiffs to determine whether those needs could be appropriately met in integrated, community-based settings.  Also, Defendants have failed to ensure that someone is actively looking for placement for all those who need placement.

22

138.    Information, such as the availability of intensive community services for outpatient treatment at a CMHC, is not provided to the treating professionals because Bryan residents are not assessed for the level of services they need until after they are discharged and living in the community.

139.    Plaintiffs' access to integrated community support services is arbitrarily limited by the policies of the Defendants.

140.    All of the individual Plaintiffs have been in Bryan Hospital for longer than 90 days.  The average length of stay for the adult, non-forensics portion of Bryan in 2012 ranged from 27 days on Lodge D to over 800 days on Lodge G.

141.    The 2013 accountability report of the Defendants was the last report that tracked the percentage of inpatients who had stays longer than 90 days.  That report noted that 69% of admitted patients stay longer than 90 days in SCDMH inpatient placements.

142.    On information and belief, the percentage has increased since 2013.

143.    Defendants place the responsibility for discharge planning of Bryan residents conjointly on the Hospital and on the SCDMH Division of Outpatient Treatment, which operates the CMHCs.[2]

144.    At Bryan, social workers are responsible for coordination of aftercare referrals and other aspects of the discharge planning process.

145.    Hospital social workers attend the Plaintiffs' treatment team meetings on a regular basis and have a therapeutic relationship with the residents.

---

[2] After receiving demands from Plaintiffs, Defendants have informed Plaintiffs that they intend to review their discharge policies, known as "Continuity of Care" policies.  As of this filing, no changes to discharge policies have been publicized by the Defendants.

146.    The CMHC is responsible for screening individuals at Bryan to see if they are ready for discharge, and for assisting with planning for their discharge and setting up aftercare appointments at the CMHC.

147.    CMHC clients who have been at Bryan for more than 90 days have their cases closed—severing the relationships between that CMHC and individuals at Bryan.  Those relationships, if maintained, could benefit the patient and streamline the discharge process.

148.    Because most residents of Bryan have been at the hospital for over 90 days, they do not have an open case at a CMHC and do not have a CMHC case manager; therefore, discharge planning is the responsibility of the hospital liaison.

149.    Each CMHC has a hospital liaison.  The hospital liaisons are SCDMH employees who work at a CMHC and have other duties at the CMHC.

150.    While the Defendants' discharge policy states that hospital liaisons should attend treatment team meetings, upon information and belief, none of the individual Plaintiffs have had a hospital liaison attend any of their treatment team meetings.  Treatment team meetings for individuals at Bryan are generally held every 28 days for individuals who have been at Bryan for at least several months.

151.    The policies, practices, and procedures of the Defendants of closing a resident's CMHC case after 90 days of an inpatient stay, and placing the discharge process responsibility on the hospital liaison, who may not have ever had a relationship with the hospital resident, results in inadequate and inappropriate discharge planning and unnecessary delays in discharge.

152.    Because of poor coordination between Bryan and CMHCs, mostly due to Defendants' policies and procedures and confusion about the policies and procedures, the discharge planning

process designed by the Defendants is arbitrary, inefficient, and convoluted.  It impedes discharge.  For example:

    a.   Much of the control of discharge is in the hands of the CMHCs, and that control can result in delays in discharge.

    b.   Patients must be "screened" by the hospital liaisons for readiness for discharge—a time consuming step when the actual treating professionals are most qualified to make the determination.

    c.   Use of "catchment" areas can be arbitrary and can cause delays in discharge, especially for rural areas with few options for placements.

    d.   Failure to use available technology, such as video conferencing, makes the process of discharge inefficient and causes needless delays in discharge.

153.   When a Bryan resident does not have an established residence, usually the only placement option considered by a resident's treating professionals and the hospital liaison is a CRCF, also known as an Assisted Living Facility.

154.   Defendants have a Memorandum of Agreement ("MOA") with some CRCFs.  The Defendants' MOA requires the CRCF to comply with criteria set by SCDMH in exchange for an agreement to provide mental health services for the residents of the CRCF.

155.   Except on rare occasions, Bryan Hospital will discharge patients only to those CRCFs with MOAs.  If the catchment area does not have any or enough CRCFs with MOAs, or if all CRCFs in the area have refused to accept a hospital resident, the liaison will report that there is no placement available, leaving the resident to languish at Bryan.

156.   Two CMHCs, Aiken-Barnwell MHC and Coastal Empire MHC, have no CRCFs with a MOA in their catchment area.  In many catchment areas, the discharge planners have little access

to CRCF placements and less access to a CRCF with a MOA. Consequently, a resident at Bryan who is from one of these catchment areas may be stuck at Bryan until another catchment area agrees to accept the resident and finds a CRCF willing to take the resident.

157. Discharges are routinely put on hold during the pursuit of a CRCF with an open bed. This wait often takes years. Bryan residents may become frustrated, upset, depressed, or their mental status may change during their long wait. In such cases, they will be determined to no longer be ready for discharge, in which case they will go back to the beginning of the process.

158. At Bryan, a hospital resident approved for discharge is treated the same as a patient who still requires acute care—the same rules and restrictions apply. The resident determined ready for discharge must obey the same visiting hours and phone limits, must adhere to the same restrictions on movement at the facility, and accrues daily bills at the same rate.

159. The discharge process includes presenting a discharge plan to the individual. For example, the treatment team may recommend the individual be discharged to a CRCF. If the individual prefers an option other than a CRCF, the process of discharge will end at that impasse, with little attempt made to consider other options, such as apartment settings with intensive supports.

160. Most of the individual Plaintiffs have been identified as needing a CRCF or higher level of care. Many of the individual Plaintiffs do not wish to live in a CRCF, but desire discharge from Bryan.

161. However, some of the Plaintiffs are afraid to disagree with any discharge plan. They believe, with good reason, that if they disagree with the discharge plan that has been proposed they will be left in the hospital for an even longer period of time.

162.    Alternatives to CRCFs are extremely limited.  Some of the alternatives include Homeshare placements, which are similar to adult foster homes.  However, the number of these placements is inadequate to meet the demands of those who would benefit from this type of placement.

163.    The Plaintiffs have been negatively impacted by the convoluted and ineffective discharge process described above.

164.    The Defendants have authorized and encouraged this discharge process through their policies, practices, and funding.

165.    Defendants fail to provide appropriate discharge planning to enable class members to live in the community.

166.    Defendants have control over and the responsibility for the policies, practices, and procedures for discharge of Bryan residents.

167.    Defendants have management control over and responsibility for the staff who implement the discharge policies, procedures, and practices.

168.    The current discharge procedures do not provide for timely discharge from Bryan Hospital.

169.    Upon information and belief, the Defendants do not systematically keep lists of who is ready for discharge, they do not have specific criteria for who is appropriate for what level of care once the individual leaves Bryan, and they do not have systems in place to ensure that placements are managed fairly.

170.    The policies and practices regarding discharge from Bryan negatively affect every individual Plaintiff, every class member, and the constituents of P&A.

**CMHC Initiation of Services After Hospitalization--Aftercare**

171.    CMHC assessment, required to be completed for an individual to receive services from the CMHC, is not performed until after the resident is discharged from Bryan.

172.    Therefore, the treatment team at Bryan must send the resident into the community without knowledge of the level of supports and services the individual will receive once he or she is discharged.  As a result, the treatment team may be more cautious and conservative than should be necessary prior to initiating the discharge and placement process, lengthening the hospital stay needlessly.

173.    SCDMH requires that the initial community assessment be done within seven days of discharge from Bryan.  However, this first appointment is simply an assessment for what services will be arranged.  It is not necessarily a time when the individual will begin treatment.

174.    CMHCs may not have access to information from Bryan, and the hospital may not have access to information from the community.  The policy and practice of Defendants, which fails to assess the need for community mental health services prior to discharge, places all Plaintiffs at risk of increased needless days in the segregated and isolated setting of Bryan Hospital.

**CRCFs**

175.    Defendants rely heavily upon CRCFs to provide placement to clients of SCDMH.

176.    Many CRCFs are large, restrictive, congregate settings, which are themselves de facto institutions.

177.    Most CRCFs house more than six, unrelated individuals.  Many CRCFs are large institutions, as large as 169 beds.

178.    In a CRCF, virtually all the residents are people with disabilities.  Residents have highly regimented schedules, which revolve around meals and administration of medication.

Roommates are often assigned, not chosen. Residents may not have a key to the facility or to their room, and they do not have a lease. The facilities often have oppressive rules and restrictions, and residents often have little or no opportunities for access to the greater community.

179. CRCFs are licensed and regulated by Department of Health and Environmental Control under S.C. DHEC Reg. 61-84.

180. Although Defendants rely heavily on CRCFs as placements for individuals being discharged from Bryan, the Defendants do not have any licensing or regulatory authority over CRCFs. CRCFs exist to provide assistance with activities of daily living. The CRCFs should not be locked facilities, but they are frequently isolated from the community. Most staff at a CRCF do not have any training in caring for people with a mental disability.

181. While Defendants operate a handful of CRCFs, most CRCFs are privately owned and operated. Of those CRCFs which are privately owned and operated, about half of the CRCF beds in South Carolina take public funding for the beds. The other half of the beds are privately funded. These privately funded beds offer an array of services and amenities, and they are more likely to be referred to as "assisted living facilities."

182. The vast majority of patients of SCDMH are concentrated in the publicly-funded subset of CRCFs.

183. P&A, which has an inspection program of CRCFs, estimates that nearly 40% of the residents in the publicly-funded CRCFs are SCDMH clients. Since CRCFs also house people with a serious mental disability who are not receiving services from SCDMH, the percentage of people in CRCF with serious mental disability is actually higher.

184.     CMHC services are very limited for some residents of CRCFs.  They may receive medication management only from the CMHC, or they may have a monthly meeting with a case worker and quarterly medication checks.  In other CMHCs, caseworkers may check on the residents at the facilities, and they may participate in the development of their plan of care.  The difference is based upon location and policies of the CMHC and not based upon the needs of the individual.

185.     Because of the Defendants' over-reliance and inappropriate reliance on CRCFs, discharge of residents at Bryan is further delayed.  Simply put, there is far more "demand" for CRCF placements than supply.

186.     The high demand for publicly-funded CRCF beds is driven by the Defendants' excessive and unnecessary reliance upon these segregated placements and the Defendants' failure to expand mental health services that are an alternative to CRCF placements, such as supported housing, supportive employment, and assertive community treatment (ACT) services.

187.     The overreliance on CRCFs and the lack of adequate or intense community mental health services places former residents of Bryan at risk of having to return to the hospital.

188.     When residents are discharged from Bryan to a CRCF, little in their life changes, as many of the institutional qualities of Bryan also exist in the CRCFs where Bryan places them.

189.     Rarely are CRCF residents who are clients of the CMHC considered for services which reduce hospitalization risk, such as psycho-social rehabilitation, supported employment services, supported housing services, or ACT services.    Because the clients are in a facility, the CMHC assumes that the clients' needs are being met.  The Defendants violate the ADA and Section 504 by causing further isolation and segregation of residents of Bryan by overly relying upon CRCFs for discharge and by not making integrated services available to the Plaintiffs.

### Defendants Forgo Community Services to
### Create and Maintain Institutional Placements

190.    Contrary to the requirements under the ADA or Section 504, Defendants have failed to provide services in the most integrated settings appropriate to the needs of SCDMH's clients.

191.    Between 2008 and 2012, state appropriations for SCDMH were reduced by over $86 million, a decrease of 39% and the largest reduction of public mental health services in the country.  These cuts fell disproportionately on already underfunded community services, rather than the institutions operated by the Defendants.

192.    SCDMH has received more money over the last three of the state's fiscal years, but funding for community mental health services has still not returned to the 2008 level for community services, which means that the increases have gone to fund the institutions operated by the Defendants.

193.    Defendants have used the increase in funding to increase, maintain, and expand institutional placements, rather than for restoring and expanding much-needed community services.

194.    SCDMH must produce an annual accountability report, to be submitted to the governor and made available to the public.  In the state fiscal year 2013/2014 accountability report, Defendants report that SCDMH's hospital admissions jumped significantly from 776 at the beginning of the fiscal year to 1025 at the end of the fiscal year.

195.    Bryan Hospital increased in size and capacity by 40 beds in 2015.

196.    Funding for additional bed days was requested by Defendants and approved by the legislature and governor for the 2016/2017 state fiscal year.  The increase for the adult care portion of Bryan Hospital was a request for an additional 7,300 bed days per year which equates to 20 new beds.

31

197.    Bryan Hospital as a whole has added three new units and now houses patients in long-term care units, acute units, forensics units, children's acute care, adolescent acute care, and an adolescent recovery program.

198.    Defendants completed the construction of two large administrative buildings in 2015 at the Bryan Hospital campus.  These new buildings house the director of the division of inpatient services at SCDMH and other administrators who support inpatient services.

199.    The average length of stay for a resident at Bryan is on the increase.  According to the minutes of the April 2013 meeting of the Mental Health Commission, the average length of stay increased at Bryan by 40 days that year.  In 2012, the average length of stay was over 400 days.

200.    Even in 2016, the Defendants' request for funding on *community* mental health is less than that requested in 2008.

201.    Defendants have failed to adequately fund community mental health services, and have failed to control the services being provided by CMHCs to ensure that funding is used in compliance with the ADA and Section 504.  Instead, Defendants have developed and continually expanded Bryan, the large central state hospital, which houses individuals who could be served in the community.

**For Decades, State-wide Reports have Identified
that Defendants Need to Improve the Discharge Process
and Increase Availability of Community Services.**

202.    Defendants have known since 1983 that they need to improve access to community

services.

203.    In 1983, long before the ADA, the South Carolina General Assembly's Legislative Audit

Council issued a report on SCDMH.

204.    The report, which included a review of admissions to Bryan, noted that individuals were

being inappropriately admitted to the hospitals; that SCDMH is "not adequately planning for

institutionalized patients' return to the community"; and that "the Department has not taken the

initiative to redirect funding to the community in order to follow-up on patients released from

psychiatric hospitals."

205.    The problems identified in the 1983 report continue today, including policies and

practices which fail to adequately plan for a patient's return to the community; fail to equitably

distribute  resources that support discharge and community integration; and fail to adequately

fund community services.

206.    Eighteen years later, in 2001, a report by a state working group, including representatives

of the Defendants, identified that Defendants were still failing to adequately plan for discharge

and failing to adequately provide services in the community.

207.    The 2001 report made recommendations relating to the need for community integration

including:

>    a.    Individuals in institutions who have indicated their desire to move to a community
>
>         setting should be discharged within one year.

33

b. Identify those in the hospital who meet criteria for Toward Local Care (TLC) and ensure they have funding to get them out of the hospital and into the program.

c. Transition consumers to the community through the TLC process by 20% annually.

d. For clients deemed to be at risk of unnecessary institutionalization, develop a community-based, pre-crisis plan.

e. Identify which patients are waiting for placement, TLC services, Homeshare, and other services and monitor this list.

f. Develop and promote a variety of housing and residential options.

g. Increase access to supported employment.

h. Buy waiver slots from the Department of Disabilities and Special Needs (DDSN).

i. Ensure the commission is fully informed regarding the state's obligations under the ADA community integration requirement.

208. Fifteen years after the 2001 report, the South Carolina Institute of Medicine and Public Health (IMPH) "convened a taskforce comprised of behavioral and mental health professionals and stakeholders from across South Carolina to address a set of priority areas related to improving care and outcomes to better serve our residents with behavioral health illness"[3]--the Behavioral Health Task Force.

209. In May of 2015, the Behavioral Health Task Force issued a report, again with the same message as the previous state-wide reports—the mental health system must focus on providing adequate community services.

210. The Behavioral Health Task Force Report identified services which are effective at preventing unnecessary hospitalization, including:

---

[3] South Carolina Institute of Medicine and Public Health, Behavioral Health Task Force, available at http://imph.org/taskforces/behavioral-health-taskforce/ .

a. Expanding hours at outpatient behavioral health service sites around the state.

b. Developing a network of Mobile Crisis Units for the entire state.

c. Creating small, highly supervised settings around the state—a more integrated setting for individuals who need intensive supports.

d. Providing permanent supportive housing units.

e. Funding rental assistance programs and associated supportive services.

f. Offering Assertive Community Treatment (ACT).

Defendants have failed to plan for and act upon most of the recommendation of these reports.

**Defendants' Actions and Omissions Discriminate Against
Plaintiffs by Causing Unnecessary Isolation and Segregation**

211.    The problems identified in the three reports, issued over four decades, continue now, resulting in discrimination against the Plaintiffs.

212.    Defendants provide more than half a million bed days in institutional placements each year.

213.    Some of the Plaintiffs have remained in the hospital, ready for and waiting on outside placement, for years.

214.    While the goal set in 2001 was to *reduce* the number of institutionalized patients by 20% per year, in 2014 SCDMH *increased* its inpatient bed capacity—moving toward an increase in reliance on institutionalization, not a decrease.

215.    Defendants requested additional appropriations for 2016/2017 to increase the census in the adult portion of Bryan.  The additional funds were approved, and the census at Bryan has risen from 139 in late 2015 to 152 in May 2017.

216.    The budget proposed by the Defendants for 2017/2018 included another 32-bed unit to be part of Bryan Hospital.

35

217.   Even though Defendants overly rely upon institutional beds and placements, SCDMH does not identify in their federal mental health block grant application that there is a need to reduce reliance upon institutional placement and to work toward providing services in integrated settings.

218.   Based upon the number of licensed beds, 530, Bryan Hospital is licensed for more beds than any other psychiatric hospital in Georgia, North Carolina, or South Carolina.

219.   Bryan Hospital is the fourth largest hospital in the state, including all the general hospitals in the major metropolitan areas.

220.   There is a consensus of professional judgment that mobile crisis intervention services are an essential part of a community mental health system and essential to reduce the need for hospitalization.  Only one out of seventeen mental health centers has a mobile crisis unit.

221.   The failure of the Defendants to provide an integrated crisis system, including a mobile crisis network, harms the Plaintiffs.  The Plaintiffs need access to integrated services when they are on pass and upon discharge, to assist them in the transition.

222.   South Carolina has a total of 1812 psychiatric hospital beds.  In contrast, North Carolina has only 1643 psychiatric hospital beds licensed in the state, even though North Carolina's population is estimated to be more than double that of South Carolina.

223.   The high number of psychiatric hospital beds in South Carolina is due in large part to the failure of the Defendants to provide adequate and appropriate community mental health services, including mobile crisis services.  In addition, Defendants fund stays at private hospitals rather than ensuring adequate funding is allocated to other, more integrated forms of crisis services.

224.   Between 2000 and 2004, expenditures on inpatient services decreased while spending on community services increased.  In 2005, spending on inpatient services increased slightly, but

spending on community services significantly outpaced the spending increases on inpatient services.

225.    Unfortunately, the trend of increasing investment in community services and decreasing investment in inpatient services ended after 2005, and actually reversed.  Beginning in 2008, spending on both inpatient and outpatient services was cut, but community services sustained much more significant cuts than inpatient services.

226.    Since 2007, using projected 2015 spending data, spending on inpatient services has increased by over $17 million; spending on community services is down by over $7 million.

<b>Plaintiffs do not have Access to the<br>Services They Need in the Community</b>

227.    Defendants are capable of providing the services which are critical to prevent unnecessary institutionalization, but access to these services is very limited for the Plaintiffs.

228.    Providing the relief requested is a reasonable modification to Defendants' policies, practices, and procedures to prevent unjustified isolation.  Community placement would be available, as required by Title II of the ADA, 28 C.F.R. § 35.130 (b) (7), with only reasonable modification in how this state provides services.

229.    Defendants already have programs designed to assist individuals to be integrated into the community.  However, these programs are either not available to the Plaintiffs, or the programs are available in insufficient quantity and quality to prevent unnecessary isolation and segregation of the Plaintiffs.  The Plaintiffs need a combination of multiple services and programs identified below, which are not adequately available.

<i>ACT</i>

230.    In the past, Defendants have successfully used Assertive Community Treatment ("ACT") to assist in deinstitutionalization.

231.    ACT is an evidence-based practice characterized by a team approach, small caseloads, and time-unlimited services.  ACT treatment is provided in the community; staff goes to the client as needed.  Crisis management is an important piece to the practice, available twenty-four hours a day.

232.    Currently, SCDMH uses ACT on a limited basis.  Few of the programs offered are programs faithful to the evidence-based ACT model, or ACT "fidelity" programs.  Instead, they are "ACT-like" programs.

233.    Only nine out of seventeen CMHCs have ACT-like services.

234.    Only one of the nine CMHCs with ACT-like services has plans to create a true ACT program with fidelity to the evidence-based ACT model.

### *Mobile Crisis*

235.    Defendants operate one mobile crisis unit.  This one unit operates out of the Charleston/Dorchester Mental Health Center.  The unit's team comprises 7.5 master level clinicians, operates 24 hours a day every day, will go anywhere in the mental health center's catchment area, and will provide services to anyone in distress.

236.    The mobile crisis team is estimated to divert 2080 visits to local emergency rooms each year, avoiding a cost of $1,500 or higher per visit.

237.    Even though this program is an apparent success, saves money, and reduces the need for hospitalization, there is still only one mobile crisis team operating in South Carolina.

238.    Very few community mental health clinics in South Carolina provide any mental health services after 5:00 p.m. or on weekends, much less care that travels to a client in distress as opposed to requiring the client to travel to a center.  Access to transportation during a crisis is a barrier to treatment for the clients of SCDMH.

239.     Most South Carolinians with mental disabilities must go to a hospital emergency room if they have a crisis after hours.  Mental health crisis services need to be available around the clock. South Carolinians with mental disabilities should not have to go to an ER for every crisis event they have that does not occur between the hours of 8:30 a.m. to 5:00 p.m., Monday through Friday.

### CTH Homes

240.     For individuals with high needs and a low level of intellectual functioning, Defendants have contracted with the Department of Disabilities and Special Needs (DDSN) to provide placements in Community Training Homes ("CTHs"), where these individuals have access to behavior support services and habilitation, as well as mental health services.  CTHs are licensed by DDSN and usually have four residents, each with their own bedroom.  Staff is on the premises 24 hours a day.

241.     CTH placements are available only to individuals who have been determined to be eligible for DDSN services, even though SCDMH partially funds the placement.

242.     CTH placements are not available to the Plaintiffs.  Access to such placements would provide intensive support in a safe environment in the community, even for SCDMH clients who are in frequent crisis or have trouble controlling their behavior, as these placements do for clients of DDSN.

243.     Defendants have plans to develop four homes that will provide intensive services, but only patients from the forensic units at Bryan will be allowed to be discharged to these homes. Also, without an *Olmstead* plan that would serve to guide the Defendants, the plan for these homes may not comply with the ADA's integration mandate and be yet another investment in an

isolated and segregated setting that offers little or no opportunities for the residents to interact with anyone but staff and other residents.

*Supported Employment*

244.    Defendants currently provide supported employment for some clients of the CMHCs, called Individual Placement and Support ("IPS").

245.    The IPS program has demonstrated success, achieving a 51.2% average competitive employment rate for people with severe mental illness.

246.    Even though this program has demonstrated success and Defendants have identified that supported employment is an evidence based program which aids individuals with mental disabilities in their recovery, it is being offered in only nine out of seventeen mental health centers, and only to approximately 500 people annually.

247.    The IPS program is available to the Plaintiffs on only a very limited basis.

*TLC*

248.    The Toward Local Care ("TLC") Program is designed to assist clients in transitioning from inpatient institutions into the community and to help avoid re-hospitalization.

249.    Based upon an arbitrary policy, the program is available only to individuals who do not meet nursing home level of care requirements.

250.    In order to qualify for the TLC program, an individual must either be hospitalized for 90 days or have had three hospitalizations in less than a year.

251.    In 2008, the capacity of the TLC program was 967.  Even though many individuals need these services, the capacity was only 1093 in 2014.

252.    Some of the TLC slots are provided in integrated settings, but many of them are not.

253. TLC slots include providing services in congregate settings of sixteen bed CRCFs, which are typically in very rural and remote locations and offer few opportunities for community integration. Additional TLC slots are in CRCFs of other sizes.

254. All of the individual Plaintiffs should qualify for the TLC program, as they have been hospitalized for longer than 90 days. Only two of the individual Plaintiffs are currently being considered or referred to the program. Because of the limited number of slots, the Plaintiffs have very limited access to these intensive services combined with a residential component. In order to enter the program, the Plaintiffs must agree to the rules of the program and may have to agree to live in a segregated facility with little access to community integration or self-determination.

### *Other Supports*

255. Defendants offer other services that the Plaintiffs would greatly benefit from but to which they have limited access. These services include:

    a. Peer support

    b. Supported Housing

256. Defendants have identified that peer support and supportive housing are evidence based programs which aid individuals with mental disabilities in their recovery.

257. However, these programs remain limited because Defendants are focused on providing services in inpatient settings in violation of their obligation to provide services in integrated settings.

### The Effect of the Failure to Develop and Implement an *Olmstead* Plan

258. Defendants emphasize segregated placements and fail to develop the community supports necessary to allow the Plaintiffs to live in the most integrated setting appropriate to their needs.

41

259.    One method to prevent discrimination by public entities in their programs is by creating an *Olmstead* Plan.

260.    An *Olmstead* Plan is a guiding document to ensure compliance with the ADA.  *See Olmstead v. L.C.*, 527 U.S. 581, 587 (1999).

261.    Defendants have not developed a working plan to ensure compliance with the *Olmstead* decision.

262.    Without an over-arching, guiding document developed by professionals in the state to meet the needs of the South Carolina residents with mental disabilities, decisions will be reactionary and not in compliance with the ADA.

## ANTI-DISCRIMINATION LAWS

### Title II of the ADA

263.    *General Prohibition against Discrimination*:  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "public entity" is defined as any state or local government or "any department, agency, . . . or other instrumentality of a State or States or local government . . . ."  42 U.S.C. § 12131(1) (A) & (B).

264.    *Specific Integration Mandate:*  The United States Department of Justice (DOJ) has promulgated regulations providing that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130 (d).  The "most integrated setting" is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ."  28 C.F.R. Pt. 35 App. B (Guidance on ADA Regulation on Nondiscrimination on

the Basis of Disability in State and Local Government Services Originally Published July 26, 1991). This provision is generally referred to as "the integration mandate."

265. *Specific Prohibition against Methods of Administration that Discriminate*: The ADA regulations state that "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State." 28 C.F.R. § 35.130 (b) (3).

266. *Specific Requirement that Reasonable Modifications be Made to Policies:* The ADA regulations state: "A public entity shall make reasonable modifications in policies, practices, or procedures when modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130 (b) (7).

267. In 1999 the United States Supreme Court held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act. *Olmstead v. L.C.*, 527 U.S. 581, 587 (1999). In doing so, the Court interpreted the ADA's integration mandate as requiring States to provide persons with disabilities treatment in community based settings, rather than institutional settings when: (1) community-based treatment is appropriate; (2) the individual does not oppose community placement; and, (3) community placement can be reasonably accommodated. *Id*.

### Section 504 of the Rehabilitation Act

268. *General Prohibition against Discrimination*: Section 504 of the Rehabilitation Act

provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794 (a); *see* 28 C.F.R. § 41.51.  A program or activity is defined as a "department, agency, . . . or other instrumentality of a State or of a local government."  29 U.S.C. § 794 (b) (1) (A).

269.    *Specific Integration Mandate*:  The United States Department of Justice (DOJ) has promulgated regulations providing that "[r]ecipients [of Federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51 (d).

270.    *Specific Prohibition Against Methods of Administration that Discriminate*:  Section 504 regulations state that "[a] recipient [of Federal financial assistance] may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:  (i) That have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons, or; (iii) That perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same state."  28 C.F.R. § 41.51 (b) (3).

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF TITLE II OF THE ADA
### (AGAINST ALL DEFENDANTS)

271.    Plaintiffs repeat and reallege the above paragraphs.

272.    This claim for relief is brought against each and every named Defendant.

273.     Plaintiffs are qualified individuals with a disability in that they (1) have physical or mental impairments that substantially limit one or more major life activities; and (2) meet the essential eligibility requirements for  services from SCDMH.

274.     Plaintiffs are qualified to participate in the treatment and programs offered by Defendants.

275.     P&A is authorized to advocate and litigate on behalf of individuals with disabilities, including advocating for them to live in the most integrated setting appropriate to their needs.

276.     Plaintiffs desire to leave the hospital.  The hospital is not the most integrated setting appropriate to the Plaintiffs' needs.

277.     Defendant Magill and the Commission are responsible for the operation of SCDMH, a public entity, covered by Title II of the ADA. 42 U.S.C. § 12131 (1) (A) & (B).

278.     Defendants' operation of the mental health system where Plaintiffs must receive services in a restrictive setting rather than in a community setting at a lower cost constitutes unlawful discrimination in violation of ADA's integration mandate.  Defendants have caused the Plaintiffs to be marooned in extremely restrictive, inappropriate, and unnecessary hospital settings.  By creating barriers to discharge, failing to provide adequate community mental health services, not creating and implementing a working *Olmstead* plan, overly relying upon CRCFs,  and generating charges of $503 per day to the Plaintiffs, Defendants have caused unjustified institutionalization in violation of the ADA's integration mandate.

279.     Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and activities.  42 U.S.C. §§ 12131, 12132.

280.    Defendants are obligated under the ADA to administer South Carolina programs, including both inpatient and outpatient programs, in a manner that supports the availability of services and programs in the most integrated setting for individuals with disabilities.

281.    Defendants have failed to provide adequate services and programs in the most integrated setting.  Without the relief provided by injunction, Defendants will fail to provide necessary care in the most integrated setting for Plaintiffs in violation of Title II of the ADA.

282.    Defendants have utilized criteria and methods of administration that subject Plaintiffs to discrimination on the basis of their disability, including unnecessary institutionalization by:  (1) failing to properly assess the services and supports that would enable Plaintiffs to remain in the community; (2) failing to ensure that Plaintiff will have access to services that will meet their needs in the community; (3) failing to make reasonable modifications to policies, procedures, practices, and programs to avoid discrimination on the basis of disability;  (4) allocating resources for institutional versus community long-term care contrary to the desires and needs of people with disabilities and contrary to the ADA and the integration mandate; (5) overly and inappropriately relying upon segregated facilities for discharge; and (6) charging Plaintiffs $503 per day for unnecessary and unjustified hospitalization.

283.    Defendants have failed to make reasonable modifications to their programs to allow Plaintiffs to receive services in the community rather than in an institution.  The cost of Plaintiffs' services at Bryan is over $503 dollars per day.  In the community, many of the services the Plaintiffs need are covered by Medicaid, providing a payment source and lessening the cost when compared to remaining in the institution.

284.    A permanent injunction is appropriate because:

a. Plaintiffs do not have access to an adequate remedy at law as they need community-based mental health treatment.

b. Plaintiffs will suffer irreparable injury if they continue to be isolated and segregated in institutions away from the community.

c. The benefits to the Plaintiffs of an injunction outweigh the burdens an injunction would place on the Defendants.

d. The right to the relief sought is clear.

285. Defendants are using methods of administration that subject individuals with disabilities to discrimination, inhibiting the ability of individuals to live in the community.

286. Defendants' actions, omissions, policies, and practices are in violation of Title II of the ADA.

**SECOND CLAIM FOR RELIEF:**
**SECTION 504 OF THE REHABILITATION ACT**
**(AGAINST ALL DEFENDANTS)**

287. Plaintiffs repeat and reallege the above paragraphs.

288. This claim for relief is brought against each and every named Defendant.

289. Plaintiffs are qualified individuals with disabilities within the meaning of Section 504, because they (1) have physical or mental impairments that substantially limit one or more major life activities; and (2) meet the essential eligibility requirements for services from SCDMH.

290. Plaintiffs are qualified to participate in the treatment and programs offered by Defendants.

291. P&A is authorized to advocate and litigate on behalf of individuals with disabilities, including advocating for them to live in the most integrated setting appropriate to their needs.

292.    Plaintiffs desire to leave the hospital.  The hospital is not the most integrated setting appropriate to the Plaintiffs' needs.

293.    Defendants are recipients of Federal financial assistance from CMS from the block grant program, the disproportionate share program, and the Medicaid and Medicare programs.  These funds are used to operate Defendants' hospitals and community programs.

294.    Defendants' operation of the mental health system where Plaintiffs must receive services in a restrictive setting rather than in a community setting at a lower cost constitutes unlawful discrimination in violation of Section 504's integration mandate.  Defendants have caused the Plaintiffs to be marooned in extremely restrictive, inappropriate, and unnecessary hospital settings.  By creating barriers to discharge, failing to provide adequate community mental health services, not creating and implementing a working *Olmstead* plan, overly relying upon CRCFs, and generating charges of $503 per day to the Plaintiffs, Defendants have caused unjustified institutionalization in violation of Section 504 and the integration mandate.

295.    Section 504 prohibits Defendants from discriminating against individuals with disabilities in programs and activities.  29 U.S.C. § 794 (a); *see* 28 C.F.R. § 41.51.

296.    Defendants have failed to provide adequate services and programs in the most integrated setting.  Without the relief provided by injunction, Defendants will fail to provide necessary care in the most integrated setting for Plaintiffs in violation of Title II of the ADA.

297.    Defendants have utilized criteria and methods of administration that subject Plaintiffs to discrimination on the basis of their disabilities, including unnecessary institutionalization by:  (1) failing to properly assess the services and supports that would enable Plaintiffs to remain in the community; (2) failing to ensure that Plaintiffs will have access to services that will meet their needs in the community; (3) failing to make reasonable modifications to policies, procedures,

practices, and programs to avoid discrimination on the basis of disability; (4) allocating resources for institutional versus community long-term care contrary to the desires and needs of people with disabilities and contrary to Section 504 and the integration mandate; (5) overly and inappropriately relying upon segregated facilities for discharge; and (6) charging Plaintiffs $503 per day for unnecessary and unjustified hospitalization.

298.    A permanent injunction is appropriate because:

   a.    Plaintiffs do not have access to an adequate remedy at law as they need community based mental health treatment.

   b.    Plaintiffs will suffer irreparable injury if they continue to be isolated and segregated in institutions away from the community.

   c.    The benefits to the Plaintiffs of an injunction outweigh the burdens an injunction would place on the Defendants.

   d.    The right to the relief sought is clear.

299.    Defendants are using methods of administration that subject individuals with disabilities to discrimination inhibiting the ability of individuals to live in the community.

300.    Defendants' actions, omissions, policies, and practices are in violation of Section 504.

## CONCLUSION

301.    The culture of the asylum persists tenaciously.

302.    The promise of the ADA and Section 504 is that individuals with mental disabilities will live integrated in the community with services and supports which keep them and the community safe.

303.    While the doors of the historic Bull Street campus have closed, Bryan is open.  Bryan

Hospital is another large central institution, which is only a ten-minute drive from its

predecessor.

304.    Defendants violate the ADA by causing needless, prolonged segregation and isolation of

residents of Bryan, by failing to provide adequate services in the community, by failing to

develop and maintain a working plan for implementing the ADA's integration mandate, by

overly and inappropriately relying upon segregated residential facilities for discharge, by

creating arbitrary barriers to discharge and accessing community mental health services, and by

charging residents $503 per day for services they do not need.

## PRAYER FOR RELIEF

WHEREFORE, having set forth the Complaint against Defendants, Plaintiffs would

respectfully pray that this Court issue an Order granting the following relief and remedies:

A.  Assume jurisdiction over this action and maintain continuing jurisdiction until

Defendants are in full compliance with every Order of this Court.

B.  Certify the class.

C.  Declare that Defendants' policies, practices, acts, and omissions, as set forth above,

violate Plaintiffs' rights under the ADA and Section 504 of the Rehabilitation Act by

*inter alia*:

1.  Leaving Plaintiffs in segregated settings when they wish to live in less restrictive

settings and are able to live in less restrictive settings if they receive appropriate

services and supports.

2.  Relying inappropriately on CRCF placements and other segregated placements

for discharge of patients at Bryan.

3. Failing to make an appropriate range and sufficient quantity of community mental health services available to Plaintiffs to prevent needless isolation and segregation.  These community mental health services include:

    a. Sufficient ACT fidelity programs to serve Plaintiffs;

    b. Sufficient supported employment services available to Plaintiffs;

    c. Sufficient supported housing programs available to the Plaintiffs; and

    d. Sufficient intensive residential services in the community for the Plaintiffs who need that type of care, regardless of whether they are clients of DDSN and similar to those services provided in a CTH.

4. Failing to insure the CMHCs are adequately involved in the care, treatment, and discharge planning of residents in Bryan Hospital.

5. Failing to provide the Plaintiffs with information about and options for receiving community services.

6. Denying Plaintiffs their entitlement to services in the most integrated setting appropriate to their needs.

7. Discriminating against Plaintiffs by utilizing methods of administration, adopting and applying policies, and engaging in practices that result in unnecessary segregation and institutionalization.

8. Failing to make reasonable modifications to policies, practices, or procedures to prevent isolation and foster community integration.

D. Declare that Defendants' policies and practices are causing Plaintiffs to remain in Bryan Hospital in violation of the ADA and Section 504 of the Rehabilitation Act.

E.  Grant a permanent injunction, enjoining Defendants from collecting the portion of the Plaintiffs' bills and fees that are for hospital stays for the period of time during which they were hospitalized but desired discharge, were ready to be discharged, and could have been discharged if the Defendants had not violated the ADA and Section 504.

F.  Grant a permanent injunction compelling Defendants, their officers, employees, attorneys, agents, and all other persons who are in active concert or participation with them from violation of Plaintiffs' rights under the ADA and Section 504 of the Rehabilitation Act.

G.  Grant a permanent injunction enjoining Defendants, their officers, employees, attorneys, subcontractors, contractors, agents, and all other persons who are in active concert or participation with them to take all actions necessary within the scope of their authority to implement the above injunctions.

H.  Maintain the injunctions above until such time as adequate community mental health services are available to the Plaintiffs to ensure they receive the services which meet their needs in the most integrated setting appropriate.

I.  Award Plaintiffs costs of this action and reasonable attorneys' fees pursuant to 29 U.S.C. § 794a; 42 U.S.C. §§ 12133, 12205, and as otherwise may be allowed by law.

J.  Grant such other and further relief as the Court deems to be just and proper.


[intentionally left blank, signature page follows]

Respectfully submitted, this the 24th day of May, 2017.

PROTECTION AND ADVOCACY FOR
PEOPLE WITH DISABILITIES, INC.

SARAH GARLAND ST. ONGE (Fed. Id. # 9875)
THORNWELL SIMONS (Fed. Id. #10355)
3710 Landmark Drive, Suite 208
Columbia, SC  29204
(803) 782-0639, Ext. 236
(803) 782-0639, Ext. 223
stonge@pandasc.org
simons@pandasc.org


WOMBLE CARLYLE SANDRIDGE & RICE, LLP

By:s/ Sean D. Houseal
SEAN HOUSEAL (Fed. Id. #7676)
DANA LANG (Fed. Id. #11199)
KATHRYN MANSFIELD (Fed. Id. #12231)
5 Exchange Street | P.O. Box 999 | Charleston, SC
29402-0999
843-722-3400 (O)
shouseal@wcsr.com
dlang@wcsr.com
kathryn.mansfield@wcsr.com

*ATTORNEYS FOR PLAINTIFFS*